**IN THE COURT OF APPEALS OF IOWA**

No. 21-1770
Filed March 2, 2022

**IN THE INTEREST OF S.C.,**
**Minor Child,**

**A.C., Mother,**
　　　Appellant.
_____

　　　Appeal from the Iowa District Court for Mahaska County, Rose Anne Mefford, District Associate Judge.

　　　A mother appeals from the termination of her parental rights.  **AFFIRMED.**

　　　Rebecca L. Petig of Bierman & Petig, P.C., Grinnell, for appellant mother.

　　　Thomas J. Miller, Attorney General, and Gretchen Witte Kraemer, Assistant Attorney General, for appellee State.

　　　Lynnette Lindgren of Faulkner, Broerman & Lindgren, Oskaloosa, attorney and guardian ad litem for minor child.

　　　Considered by Tabor, P.J., and Greer and Ahlers, JJ.

**GREER, Judge.**

The mother,[1] A.C., appeals from the termination of her parental rights to her child, S.C., born in 2019.  She argues that the State did not prove the statutory grounds for termination, the State did not make reasonable efforts to reunify her with the child, the juvenile court should have granted her a six-month extension, and termination is not in the best interests of the child.  Because the State provided clear and convincing evidence to find that the mother and child could not be reunified at the time of the termination hearing, the mother never requested additional services, the mother did not prove that reunification would be possible after six more months, and the child's best interests are served by termination, we affirm the juvenile court's termination of the mother's parental rights.

**Background Facts and Proceedings.**

In January 2021, a friend found the mother and her boyfriend in their room.  Neither could be woken, and S.C. was unattended and soaked in urine.  The home had multiple animals along with feces, dirt, and food on the floor.  Police informed DHS of the situation and shared that the mother had no diapers or wipes for the child.  A DHS child protective services worker (CPS) visited the home the next day and found it clean and hazard free.  But, less than ten days later, law enforcement received reports that the child was seen outside in only a diaper despite blizzard-like conditions.  When officers arrived at the home, the mother would not let them enter.  The officer noted that the child was indeed only in her diaper and her skin

---

[1] The father was incarcerated throughout the involvement of the Iowa Department of Human Services (DHS) with the family.  His parental rights were also terminated. He is not a party to this appeal.

was red.  The next day, the mother contacted a woman online whom she had met a few times through the child's father.  The mother gave the child to the woman and her husband[2] and, in return, asked for twenty dollars for dog food.  The mother offered them a note giving the woman custody of the child.  Because the child had what appeared to be dog bites on her buttocks, the woman and her husband took the child to the doctor, who also noted that the child's leg muscles were developmentally weak.[3]  Once DHS learned of the handoff of the child, along with allegations that the mother was using methamphetamine, service providers began calling the mother, but her phone was not in service.  DHS requested the child be removed from the mother's care and petitioned for the child to be adjudicated a child in need of assistance (CINA), and the child was placed in foster care.

The mother was eventually found and interviewed by CPS.  She stated she had ended her relationship with her boyfriend, reconciled with the child's father, and moved in with the paternal grandmother.  The mother denied taking the child out in the cold without proper winter clothing but admitted leaving the child with the other family.  Ultimately, the allegations of child abuse through denial of critical care—failure to provide proper supervision—were founded against the mother.  Yet the concerns about her drug use were not verified.

The child was adjudicated CINA at the end of February and removed from the mother's care and custody.  The mother began participating in services, including obtaining a mental-health evaluation, substance-abuse evaluation, and

---

[2] There were allegations the woman had a history of assault charges and her husband was on probation for manufacturing marijuana.

[3] The paternal grandmother attributed the leg weakness to the mother leaving the child in the high chair for extended periods of time.

psychological assessment, and engaging in fully supervised visits, parenting classes, and SafeCare. The mental-health evaluation led to a diagnosis of major depressive disorder, post-traumatic stress disorder (PTSD), and panic disorder. But, after the substance-abuse evaluation, no treatment was recommended. Subsequent drug tests all came back negative. The mother attended some mental-health counseling sessions, but stopped going in July despite reporting to providers she was still attending.[4]

At the termination hearing, a provider testified that she called the facility that morning and was told the mother had not been attending appointments. The mother testified, however, that she had been going and provided the names of counselors. The mother also told providers in the month leading up to the termination hearing that she was previously diagnosed with schizophrenia and had run out of her medication; she had an appointment scheduled but did not have a new prescription as of October 2021. She struggled to complete the requirements to file for disability. Still, she was taking her prescribed medication at the time of the termination hearing and had successfully completed both the parenting classes and SafeCare.

Throughout DHS's involvement, the mother had many temporary living arrangements. She left the paternal grandmother's home because the relationship with the paternal grandmother was not healthy for her and the mother began self-harming. She then moved in with a friend who would not allow DHS visits to occur in her home because the friend had three of her own children taken from her care

---

[4] The mother missed the one appointment scheduled in July, two scheduled in August, and one scheduled in September with a different provider.

by DHS.  The mother then moved in with another friend who also had children removed from her care and had previous issues with methamphetamine use. While living with the second friend, the mother failed to secure a release from her roommate so DHS could conduct a background check.  The mother testified that she had not seen this friend using drugs but was unsure if the friend was clean of substances.  And during the mother's visitation, it was observed that this roommate would call the mother to ask for upwards of $100 at a time.  Providers explained their concerns to the mother about her continuing to live with this friend, especially if the child was to be returned to her care, but she found no alternate housing.[5] She also had on-again, off-again relationships with both the boyfriend and the father; the latter relationship was described by one provider as toxic and controlling.  But, in the month before the termination hearing, the mother secured employment as a waitress at a local restaurant.

Multiple providers testified as to the mother and child's strong bond, and the mother attended all of her twice-weekly visits, even scheduling additional visits when they could be provided.  But, she often had to be prompted or redirected during the visits to engage with the child, stay focused, and not yell.  The provider who supervised the visits testified that the mother would try and persuade the child to play on her phone rather than getting up and playing, even if the child was not interested.  The mother did not consistently bring baby supplies or toys for the visit. Often the mother would choose to be on her phone with the boyfriend during her visits with the child.  The providers had to correct the mother on how she disciplined

---

[5] By the time of the termination hearing, the mother had applied for housing through the Department of Housing and Urban Development but was waiting approval.

the child and changed her diaper. Because of the lack of progress in her parenting skills, despite parenting classes and hands-on instruction, visits never progressed beyond fully-supervised.

At the termination hearing,[6] the DHS social worker testified the department did not feel comfortable returning the child to the mother's care because of her fluctuating romantic relationships, her non-attendance at mental-health appointments, and the unstable living situation. Overall, there was concern the mother would return to her pre-removal behavior and not provide the child proper supervision. The social worker testified that she did not believe enough progress could be made in the next six months to warrant an extension. She also stated that the mother had not requested any additional services or additional efforts for reunification. The SafeCare provider who attended some visits testified on behalf of the mother, stating the mother had adequately finished the SafeCare modules and there were no safety concerns during the visits. But the provider admitted she would worry about the child being left alone with the mother for more than a couple of hours.

The mother does not have a driver's license or a car. Her plan, if the child was returned to her, was to have a neighbor drop the child off with the maternal cousin or aunt, whom the mother intended to ask to provide child care while she was at work. When the father was released from prison, she expected the two of them to find other housing. Even so, she also stated she would be willing to set aside her relationship with the father to keep the child in her care.

---

[6] The termination hearing occurred across two days, October 4 and October 25.

The court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(h) (2021) in a November order. The mother timely appealed.

**Discussion.**

We review a termination of parental rights de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). We typically follow a three step framework, which begins with analyzing the statutory grounds on which the court terminated the parent's rights, then considering the child's best interests, and then addressing any exceptions to the need for termination provided in Iowa Code section 232.116(3). *Id.* at 40–41. But, if one of these three steps is not challenged by the parent, we do not consider it. *See id.* at 40 ("Because the father does not dispute the existence of the [statutory] grounds . . . we do not have to discuss this step."). The mother here raises four challenges to the termination of her parental rights: that the State did not prove by clear and convincing evidence the elements supporting termination under section 232.116(1)(h); the State did not make reasonable efforts to reunite the mother and child; the juvenile court should have granted her a six-month extension rather than terminating her rights; and termination is not in the best interests of the child. We address each challenge in turn.

**Statutory Grounds.**

The mother argues that the State did not prove the elements required by section 232.116(1)(h). Specifically, she disputes the last element, which requires the State to prove "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." *See* Iowa Code § 232.116(1)(h)(4). Our supreme court has

interpreted this to mean the child would be able to be returned at the time of the termination hearing. *See In re D.W.*, 791 N.W.2d 703, 708 (Iowa 2010).

The State provided ample evidence that the mother could not resume custody at the time of termination. While the mother loves the child and we laud her for following many of the State's recommendations, she did not have appropriate housing for the child, had not made a concrete plan for child care, and had no personal transportation. More concerning, she was still in the midst of regaining her footing with her mental-health treatment. And, providers testified that they did not feel comfortable moving the mother into unsupervised visits or leaving the child with her overnight, let alone offering a green light to full-time parenting responsibilities. The mother, in closing argument at the termination hearing, admitted that what she was really asking for was more time and services to get her to the point of taking over custody. We find that the State satisfied its burden of proof on the statutory elements.

**Reasonable Efforts.**

As an extension of her previous argument, the mother argues that reasonable efforts were not made towards reunification by the State. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent."). Still, "[i]n general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding." *In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002); *see also C.B.*, 611 N.W.2d at 293–94 ("We have repeatedly emphasized the importance for a parent to object to services early in the process so appropriate changes can be made.")

Telling a social worker alone is not enough; the parent must tell the court of any shortcomings. *C.H.*, 652 N.W.2d at 148. The mother faults DHS for not pursuing recommendations from the psychological assessment and from the parenting evaluation.[7] But it takes two to tango. Following the mental-health evaluation, the mother stopped attending mental-health sessions. Nothing in the record shows the mother alerted the court to a problem or asked for additional services. Without that earlier challenge, there is no basis to address the issue further.

**Additional Six Months.**

The mother's third argument is that, rather than termination, she should have been granted an additional six months to become ready to take on custody of the child. *See In re W.T.*, 967 N.W.2d 315, 322 (Iowa 2021); *see also* Iowa Code § 232.117(5) ("If after a hearing the court does not order the termination of parental rights . . . the court may adjudicate the child to be a child in need of assistance and may enter an order in accordance with the provisions of section . . . 232.104."); *see also id.* § 232.104(2)(b) (permitting the juvenile court to "enter an order pursuant to section 232.102 to continue placement of the child for an additional six months"). A six-month extension is appropriate when the parent can prove barriers to reunification would be alleviated within that time. *W.T.*, 967 N.W.2d at 323; *see also* Iowa Code § 232.104(2)(b).

Here, the child had been out of the mother's care for nine months at the time of the termination hearing; yet, we acknowledge that the mother made progress towards reunification. Still, she had not secured adequate housing or

---

[7] We cannot help but note with concern that the testimony confirmed a three-month delay in scheduling these necessary evaluation tools.

proved to providers that she could care for the child on a full-time basis. Neither in her argument in front of the juvenile court nor in her brief has she supplied us with a plan of action; instead, she offers only that with more services, it is feasible that six months could be enough time. And, in contrast, the DHS social worker testified that she did not believe the mother could change in six months and other witnesses believed that the mother would return to her pre-removal behavior without DHS's involvement. As the mother has not shown that she and the child could be reunified in six months, an extension is not appropriate. *See In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) ("It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." (citation omitted)).

**Best Interests.**

The mother's final challenge concerns the child's best interests. When considering the child's best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). In her petition on appeal, the mother generally states that termination is not in the child's best interests with some reference to a strong bond between the two. Assuming that is the theme, we note: "It is simply not in the best interests of children to continue to keep them in temporary foster homes while the natural parents get their lives together." *In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) (citation omitted). "Courts are obliged to move urgently to achieve the ends that will best serve the child's interests because childhood does

not 'await the wanderings of judicial process.'" *In re J.C.*, 857 N.W.2d 495, 502 (Iowa 2014) (citation omitted). After reviewing the considerations involved with a best-interests claim, we find the child's needs are best met by termination of the mother's parental rights so that the child can be nurtured in a stable forever home.

**Conclusion.**

Because the State sufficiently proved that the child could not be returned to the mother's custody at the time of the termination hearing, the mother did not preserve error as to the State's reasonable efforts, the mother did not show an additional six months would have eliminated the barriers to reunification, and because the termination is in the best interests of the child, we affirm the juvenile court's ruling.

**AFFIRMED.**